# In the United States Court of Federal Claims

No. 23-174

(Filed: August 22, 2024)

```
*************************************
JEREMIAH BOTELLO, et al.,            *
                                     *
                Plaintiffs,          *
                                     *
        v.                           *
                                     *
THE UNITED STATES,                   *
                                     *
                Defendant.           *
*************************************
```

*Dale F. Saran*, Dale F. Saran, LLC, Olathe, KS, counsel for Plaintiff. With whom were *Brandon Johnson* and *J. Andrew Meyer*, St. Petersburg, FL, and *Barry Steinberg*, Kutak Rock, LLP, Washington, DC, of counsel.

*Kyle S. Beckrich*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Holly K. Bryant*, U.S. Army Legal Services Agency, of counsel.

## OPINION AND ORDER

**DIETZ, Judge.**

The plaintiffs in this class action, current and former members of the Army National Guard and Air National Guard, sue the United States for backpay and other relief, alleging that they suffered adverse personnel action by the military due to their COVID-19 vaccination status. Before the Court is the government's motion to dismiss the first amended complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and for failure to state a claim under RCFC 12(b)(6). For the reasons stated below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion.

## I.     BACKGROUND

On August 24, 2021, Secretary of Defense Lloyd Austin III issued a COVID-19 vaccine mandate ("the Mandate"). [ECF 1-2] at 2-3.[1][2] Therein, Secretary Austin "direct[ed] the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under [Department of Defense ('DoD')] authority on active duty or in the

---

[1] The operative complaint is the First Amended Complaint, which was filed on August 4, 2023, and appears on the docket at [ECF 20]. Because the plaintiffs' First Amended Complaint references the exhibits attached to the original complaint, the Court also cites to the exhibits attached to the original complaint. [ECF 1].

[2] All page numbers in the parties' filings refer to the page number generated by the CM/ECF system.

Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19." *Id.* at 2. He explained that the "[m]andatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance." *Id.* On November 30, 2021, Secretary Austin ordered the Secretaries of the Military Departments to "issue similar guidance and policy for members of the Ready Reserve, in addition to the guidance and policy issued by the Secretaries of the Army and the Air Force, with respect to members of the non-federalized National Guard." [ECF 1-3] at 2. On September 14, 2021, following Secretary Austin's issuance of the Mandate, the Army issued an order implementing the Mandate for active duty and reserve components, which set a target of 100% vaccination. [ECF 1-8] at 10, ¶ 3.D.14. On December 7, 2021, the Air Force issued supplemental guidelines for implementing the Mandate for the Air Force and Space Force, Air Force Reserve, and Air National Guard members. [ECF 1-7] at 2-3.

On December 27, 2021, Congress enacted the National Defense Authorization Act ("NDAA") for fiscal year 2022. Pub. L. No. 117-81 (2021) ("2022 NDAA"). Section 736 of the 2022 NDAA provided that any covered member of the armed forces who failed to comply with the Mandate could only receive either "an honorable discharge" or "a general discharge under honorable conditions." *Id.* § 736(a)(1)-(2). On December 23, 2022, Congress enacted the National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263 (2022) ("2023 NDAA"). Section 525 of the 2023 NDAA directed the Secretary of Defense to rescind the Mandate. *Id.* § 525. Shortly thereafter, on January 10, 2023, Secretary Austin rescinded the Mandate. [ECF 1-4]. He stated the following:

> No individuals currently serving in the Armed Forces shall be separated solely on the basis of their refusal to receive the COVID-19 vaccination if they sought an accommodation on religious, administrative, or medical grounds. The Military Departments will update the records of such individuals to remove any adverse actions solely associated with denials of such requests, including letters of reprimand. The Secretaries of the Military Departments will further cease any ongoing reviews of current Service member religious, administrative, or medical accommodation requests solely for exemption from the COVID-19 vaccine or appeals of denials of such requests.

*Id.* at 2. The Secretary further stated:

> For Service members administratively discharged on the sole basis that the Service member failed to obey a lawful order to receive a vaccine for COVID-19, the Department is precluded by law from awarding any characterization less than a general (under honorable conditions) discharge. Former Service members may petition their Military Department's Discharge Review Boards and Boards for Correction of Military or Naval Records to individually request a correction to their personnel records, including records regarding the characterization of their discharge.

2

*Id.* at 3.

Following Secretary Austin's recission of the Mandate, the DoD issued guidelines for implementing the change in policy. For example, on February 24, 2023, the Deputy Secretary of Defense explained that the Secretary's recission of the Mandate "also rendered all DoD Component policies, directives, and guidance implementing those vaccination mandates as no longer in effect as of January 10, 2023." Def.'s Mot. to Dismiss [ECF 23] at 49. The Deputy Secretary clarified that, except if required for foreign travel or if required under a new immunization mandate, "DoD Component heads and commanders will not require a Service member . . . to be vaccinated against COVID-19, nor consider a Service member's COVID-19 immunization status in making deployment, assignment, and other operational decisions, . . . ." *Id.* at 50. In addition, each branch of the Armed Services issued its own directives for implementing the rescission. *See id.* at 51-55 (Army directive); *id.* at 57-59 (Air Force directive); *id.* at 60-61 (Navy directive).

On February 8, 2023, nine named plaintiffs filed the instant class action. Class Action Compl. [ECF 1]. On June 9, 2023, the government moved to dismiss the complaint under RCFC 12(b)(1) and RCFC 12(b)(6). Def.'s Mot. to Dismiss [ECF 11]. Thereafter, six named plaintiffs filed an amended complaint. First Am. Class Action Compl. [ECF 13]. On August 1, 2023, eight of the nine original named plaintiffs voluntarily dismissed their claims against the government. Notice of Voluntary Dismissal [ECF 15]. On August 4, 2023, the six named plaintiffs who filed an amended complaint filed another amended complaint—the operative complaint. First Am. Class Action Compl. [ECF 20]. These six named plaintiffs are Jeremiah Botello, Benjamin Konie, Charles Hood, Victor Santos, Justin Phillips, and Brian Taylor. *Id.* at 1. They are current and former members of the Army National Guard and Air National Guard. *Id.* ¶¶ 16-24.

The plaintiffs assert six counts in their amended complaint: (1) Violation of the Militia Clauses, *id.* ¶¶ 245-66; (2) Violation of the 2023 NDAA, *id.* ¶¶ 267-90; (3) Violation of 10 U.S.C. § 1107a and the 2023 NDAA, *id.* ¶¶ 291-319; (4) Violation of the Religious Freedom Restoration Act ("RFRA") and the Military Pay Act ("MPA"), *id.* ¶¶ 320-34; (5) Illegal Exaction, *id.* ¶¶ 335-41; and (6) Correction of Military Records, *id.* ¶¶ 342-45. In addition to class certification, they seek $500,000 in backpay, as well as reinstatement, correction of military records, and other appropriate relief. *Id.* ¶¶ 346-53. On September 29, 2023, the government filed the instant motion to dismiss the plaintiffs' amended complaint under RCFC 12(b)(1) and RCFC 12(b)(6), arguing that the Court lacks subject matter jurisdiction over the plaintiffs' claims and that the plaintiffs fail to state claims upon which relief may be granted.[3] [ECF 23]. The government's motion to dismiss is fully briefed, *see* [ECFs 24, 26], and the Court held oral argument on March 6, 2024.

## II.   LEGAL STANDARDS OF REVIEW

When the government moves to dismiss the complaint under Rule 12(b)(1), the plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence.

---

[3] The Court need not address the arguments made in the government's June 9, 2023, motion to dismiss [ECF 11], as it predates the filing of the First Amended Complaint, the operative complaint.

*Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775 (Fed. Cir. 2021). When considering such a motion, "this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor." *Cal. Dep't of Water Res. v. United States*, 128 Fed. Cl. 603, 609 (2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, the "court accepts only uncontroverted factual allegations as true for purposes of the motion." *U.S. Enrichment Corp. v. United States*, 121 Fed. Cl. 532, 534 (2015) (quoting *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014)). "[D]isputed facts outside the pleadings are subject to the fact finding of the court." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011). "Whether the court possesses jurisdiction to decide the merits of a case is a threshold matter." *Sandstone Assocs., Inc. v. United States*, 146 Fed. Cl. 109, 112 (2019) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). If the Court determines that it lacks subject-matter jurisdiction, it must dismiss the case. RCFC 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (requiring a pleading to offer "more than labels and conclusions"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Rather, a plaintiff must plead sufficient factual matter to "raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

### III. DISCUSSION

The government moves to dismiss each of the plaintiffs' six counts under either RCFC 12(b)(1) or 12(b)(6). *See* [ECF 23] at 20. For the reasons explained below, the Court concludes that it lacks subject matter jurisdiction over those portions of Count I that rely on the Militia Clauses as an independent money-mandating source of law and all of Count II for violation of Section 525 of the 2023 NDAA because neither the Militia Clauses nor Section 525 can fairly be interpreted to mandate the payment of money by the United States. The Court also concludes that each of the plaintiffs (except for Mr. Taylor) adequately states a claim for relief under the MPA based on a violation of the Militia Clauses in Count I and a violation of 10 U.S.C. § 1107a in Count III, that two of the plaintiffs (Messrs. Konie and Santos) adequately state a claim for relief under the MPA for a violation of the RFRA in Count IV, and that none of the plaintiffs adequately state a claim for an illegal exaction in Count V or for correction of military records in Count VI.

    **A.    Counts I and II – Claims Under the Militia Clauses and Section 525 of the 2023 NDAA**

Under the Tucker Act, this Court has jurisdiction over claims against the United States for money damages "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United

States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). "Thus, the Tucker Act does not create any substantive right enforceable against the United States for money damages, but merely confers jurisdiction when such a right is conferred elsewhere." *Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007) (citing *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)). A claim for money damages against the United States must be premised upon a separate source of law, such as "a money-mandating constitutional provision, statute, or regulation." *Holland v. United States*, 149 Fed. Cl. 543, 551 (2020) (quoting *Downey v. United States*, 147 Fed. Cl. 171, 175 (2020)). "When the source of such alleged right is a statute, it can only support jurisdiction if it qualifies, as most statutes do not, as money-mandating." *Adair v. United States*, 497 F.3d at 1250 (citing *White Mountain Apache Tribe*, 537 U.S. at 473). To prove that an independent source of law is money-mandating, a plaintiff must show that the source relied upon "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)).

### 1.     *Count I – Violation of the Militia Clauses*

According to the plaintiffs, "[t]he Militia Clauses of the Constitution . . . explicitly and exclusively vest the governance of—and therefore, the power to punish—non-federalized Militia members[, which includes National Guard members,] with their respective State Commander-in-Chief, rather than the President." [ECF 20] ¶ 2; *see also id.* ¶ 3. In Count I, the plaintiffs claim that the President and DoD leadership violated the Militia Clauses by punishing them for refusing to comply with an unlawful Mandate. *See, e.g.*, *id.* ¶ 258 ("withholding [] pay from individual Militia members, prohibiting them from participating in drill, training, and other duties, and threats of courts-martial and punishment under the [Uniform Code of Military Justice]"); *id.* ¶ 260 ("involuntarily transferring them from active status to inactive status"); *id.* ("cancelling [] orders to full-time active status"). The plaintiffs assert that "the Militia Clauses are fairly interpreted as [a] stand-alone, independent, self-executing 'money-mandating' source of federal law that confers substantive rights to monetary damages[.]" *Id*. ¶ 247. The government argues that the Militia Clauses are not money-mandating, and, therefore, the Court lacks jurisdiction over Count I. [ECF 23] at 24. The Court finds that the Militia Clauses are not an independent money-mandating source of law.

Because the source of the alleged right is the Constitution, the Court begins by examining the constitutional language at issue. *See United States v. Rahimi*, 144 S. Ct. 1889, 1910-11 (2024) (J. Kavanaugh, concurring) ("The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution[.]"). The Militia Clauses provide that Congress shall have the power:

> [t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; [and t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

5

U.S. Const. art. I, § 8, cls. 15-16. There is nothing in the plain language of these clauses that can be fairly interpreted as mandating the payment of money. *See Ewers v. United States*, 168 Fed. Cl. 812, 817 (2024) (holding that the court lacked jurisdiction over the plaintiff's extradition claim because the plain language of the Extradition Clause was not money-mandating). Notwithstanding the plain language, the plaintiffs contend that, like the Compensation Clause and Export Clause, "the Militia Clauses are independent, self-executing Constitutional provisions that confer to Militia members a substantive right for money damages to remedy violations." Pls.' Resp. [ECF 24] at 20. The Court is not persuaded by the plaintiffs' reasoning.

First, the plaintiffs cite *Hatter v. United States*, 953 F.2d 626 (Fed. Cir. 1992), for the proposition that "[t]he language and purpose of the Militia Clauses[, like the Compensation and Export Clauses] similarly 'embrace[] a self-executing compensatory remedy.'" [ECF 24] at 20 (quoting *Hatter*, 953 F.2d at 628-29). The Militia Clauses, however, do not contain money-mandating language like, for instance, the Compensation Clause, which states that judges "shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const., art. III, § 1. In *Hatter*, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") held that the Compensation Clause "mandates the payment of money in the event of a prohibited compensation diminution." 953 F.2d at 628. The Federal Circuit explained that "[t]his language presupposes damages as the remedy for a governmental act violating the compensation clause" because "[o]nly a timely restoration of lost compensation would prevent violation of the Constitution's prohibition against diminution of judicial salaries." *Id*. The Militia Clauses do not contain any similar language that mandates the payment of compensation or damages to service members.

Next, the plaintiffs cite *Cyprus Amax Coal Company v. United States*, 205 F.3d 1369, 1371 (Fed. Cir. 2000), for the proposition that, like the Compensation and Export Clauses, "the Militia Clauses use absolute and unconditional language prohibiting federal punishment of non-federalized Militia members." [ECF 24] at 20 (internal citation omitted). In *Cyprus Amax*, the Federal Circuit held that the Export Clause, which states that "[n]o Tax or Duty shall be laid on Articles exported from any State," U.S. Const. art. I, 9, cl. 5, was money-mandating because, by expressly restricting Congress's taxation power, the Clause thereby mandates the refund of monies improperly collected, *Cyprus Amax*, 205 F.3d at 1373. The Federal Circuit also held that a "cause of action based on the Export Clause is self-executing." *Id*. at 1374. Referencing its previous holding in *Hatter*, the Federal Circuit explained that "regardless of whether a constitutional provision refers to compensation, duty, or tax, the pertinent inquiry is whether that provision contemplates money damages as a remedy for its violation . . . [and, in both cases,] the constitutional provision relied on by plaintiffs provides for money damages." *Id*. at 1376.

Also known as "the Calling Forth and Organizing Clauses[, the Militia Clauses] empower Congress to provide for 'organizing,' 'arming,' and 'disciplining' the militia[, now known as the National Guard,] at all times; . . . ." *Abbott*, 70 F.4th at 828. While the Militia Clauses may certainly be subject to violation, there is nothing in the plain language of these clauses that contemplates money damages as a remedy for its violation. *See Cyprus Amax*, 205 F.3d at 1373. Further, unlike the Export Clause and Compensation Clause, the Militia Clauses do not "speak in absolute and unconditional terms . . . [or] protect pecuniary interests." *Id*. at 1375. Thus, the

6

plaintiffs fail to persuade the Court that the Militia Clauses mandate—either expressly or implicitly—the payment of monies for government actions taken in contravention of the clauses. Accordingly, to the extent the allegations in Count I rely on the Militia Clauses as an independent money-mandating source of law, the Court dismisses those portions of Count I under RCFC 12(b)(1) for lack of subject matter jurisdiction. Nevertheless, as explained below, the Court cannot entirely dismiss Count I because the plaintiffs have adequately stated a claim for backpay and other relief under the MPA for violation of the Militia Clauses.

### 2. *Count II – Violation of Section 525 of the 2023 NDAA*

In Count II, the plaintiffs claim that the government violated Section 525 of the 2023 NDAA by refusing to provide them with backpay following the rescission of the Mandate. [ECF 20] ¶¶ 288, 290. The government argues that, under the Tucker Act, the Court lacks jurisdiction over Count II because Section 525 is not money-mandating. [ECF 23] at 24. Alternatively, the government argues that, even if the statute is money-mandating, the plaintiffs fail to state a claim because Section 525 does not apply retroactively, and the government denied them backpay before the 2023 NDAA was enacted. *Id.* at 27, 31. The plaintiffs contend that the Court should not read Section 525 in a vacuum and that, when read with other laws, it qualifies as money-mandating.[4] [ECF 24] at 29. For the reasons stated below, the Court dismisses Count II under RCFC 12(b)(1) for lack of subject matter jurisdiction.

The Court begins by examining the statutory language at issue. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) (stating that "[w]e begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). Section 525 of the 2023 NDAA provides as follows:

> Not later than 30 days after the date of the enactment of this Act, the Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated against COVID-19 pursuant to the memorandum dated August 24, 2021, regarding "Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members."

2023 NDAA, § 525. As with the Militia Clauses, there is nothing in the plain language of Section 525 that can be fairly interpreted as mandating the payment of money. Nevertheless, the plaintiffs suggest that it can be viewed as money-mandating when viewed in conjunction with other statutes and regulations: "The 2023 NDAA Rescission, in conjunction with the 2023 Appropriations Act, the [MPA] and other applicable federal laws and regulations on which Plaintiffs rely, . . . [can] fairly [be] interpreted as a 'money-mandating' source of federal law . . .

---

[4] Although the plaintiffs argue in their response to the government's motion to dismiss that Section 525 should be read in conjunction with other statutes, such as "the 2023 Appropriations Act, the Military Pay Act and other applicable federal laws and regulations on which Plaintiffs rely," [ECF 24] at 29 (citing [ECF 20] ¶ 11), in Count II, the plaintiffs only allege a violation of Section 525. Therefore, as to Count II, the Court need not address whether Section 525 would be money-mandating when viewed in conjunction with other laws.

." [ECF 24] at 29. According to the plaintiffs, "[t]his Court has routinely found provisions of previous NDAAs and other money-authorizing or appropriations statutes to be 'money mandating' where there was a separate source of federal law for determining the standards, amounts and conditions for payment." *Id.* at 30. In support of their position, the plaintiffs cite *Collins v. United States*, 101 Fed. Cl. 435 (2011), arguing that in that case, "this Court held the NDAA provisions that repealed—not *rescinded*, but only repealed—the unconstitutional 'Don't Ask, Don't Tell' policy were money-mandating in conjunction with the Separation Pay Statute, 10 U.S.C. § 1174, which Plaintiffs here have identified as a money-mandating statute." *Id.* (emphasis in original).

The Court is not persuaded by this argument. In *Collins*, the issue before the court was whether 10 U.S.C. § 1174, which Congress amended, via the 1991 NDAA, to extend the "eligibility to receive separation pay to regular enlisted personnel who had served at least six, but less than twenty, years in the active service of one of the military branches," was money-mandating. 101 Fed. Cl. at 443. Significantly, the court first noted that the plain language of Section 1174 stated that qualified personnel were "entitled" to payment. *Id.* at 449. The court then found that Section 1174 was money-mandating because it and its accompanying regulations (1) provided clear payment standards, *id.* at 458; (2) identified three precise payment amounts, *id.* at 458-59; and (3) compelled payment in certain situations despite the Secretary of Defense's discretionary authority to withhold payment, *id.* at 459. Unlike the 1991 NDAA in Collins, which amended service member entitlements to separation pay under Section 1174, Section 525 does not amend a pay statute or otherwise entitle service members to monetary compensation; therefore, *Collins* is distinguishable from the case at bar.

Further, the Court is not persuaded by the three additional cases the plaintiffs cite in support of their contention that Section 525 is money-mandating, *see* [ECF 24] at 30 n.17, as each of these cases is also distinguishable. First, plaintiffs cite *Striplin v. United States*, 100 Fed. Cl. 493, 500-01 (2011), for the proposition that "NDAA provisions [can] be money-mandating where they establish[] conditions for waiver of pay limitations." [ECF 24] at 30 n.17. The court's holding in *Striplin* is not as broad as the plaintiffs suggest. In *Striplin*, the relevant NDAA provision stated that "the head of an executive agency may waive . . . the limitation established in [5 U.S.C. § 5547] for total compensation (including limitations on the aggregate of basic pay and premium pay payable in a calendar year) of an employee who performs work while in an overseas location that is in the area of responsibility of the commander of the United States Central Command, in direct support of or directly related to a military operation." 100 Fed. Cl. at 500 n.10 (quoting NDAA for Fiscal Year 2006, Pub. L. No. 109-163, § 1105, 119 Stat. 3136, 3450- 51 (2006)). The court ultimately held that the plaintiff identified a money-mandating source of law for his claim that the Army failed to pay him the full amount of the authorized adjusted pay. *Id.* at 500. The court explained that, while the NDAA provision provided the agency with discretion to waive the pay limitation, the Army had exercised such discretion by establishing detailed criteria to determine whether an employee is eligible for the increased pay limitation. *Id.* at 501. Thus, the court stated that "[a]lthough authority to determine when employees meet the 'eligibility criteria' is delegated [to various military officials and is therefore discretionary] . . . , there is no indication that these officials can deny this increase in pay if the 'eligibility criteria' are met." *Id.* In other words, the reason the court determined that the provision was money-mandating was because, after DoD officials exercised their discretionary

8

authority and identified eligibility criteria, the provision at issue mandated the payment of monies to eligible individuals. *See id.* The instant case is distinguishable because Section 525 does not expressly relate to the compensation of service members. It merely requires the Secretary to rescind the Mandate.

Next, the plaintiffs cite *San Antonio Housing Authority v. United States*, 143 Fed. Cl. 425, 475-76 (2019), for the proposition that "appropriations are money-mandating where [a] separate statute prohibited diminution in funding to specific group." [ECF 24] at 30 n.17. In *San Antonio Hous. Auth.*, a public housing agency asserted three bases of jurisdiction in its suit against the government for money damages—breach of contract and violation of two appropriations acts. 143 Fed. Cl. at 433. Plaintiffs cite a portion of the opinion in which the court held that a section of a particular statute was money-mandating because it "imposes a specific obligation on the Government." *Id.* at 475 (internal quotation marks omitted). The court explained that the statute imposed a specific obligation on the government because it "states that federal funding received by [the] agency 'shall not be diminished' by the government because of the [] agency's participation in the [] program." *Id.* (emphasis in original). In the instant case, there is no language in Section 525 that similarly imposes an obligation on the government not to diminish compensation received by service members.

Lastly, the plaintiffs cite *Lummi Tribe of Lummi v. United States*, 99 Fed. Cl. 584, 603-04 (2011), arguing that in that case, the court held that a "statute providing grants to specific Indian tribes was money-mandating." [ECF 24] at 30 n.17. In *Lummi Tribe of Lummi*, as in *San Antonio Hous. Auth.*, the court identified language in the statute that mandated the payment of money to the plaintiff. *Id.* at 594. Specifically, the court held that the statute, which provided that the Secretary of Housing and Urban Development "'*shall* . . . make grants' and '*shall* allocate any amounts' among Indian tribes that comply with certain requirements," was money-mandating. *Id.* (emphases and omission in original). Section 525, however, does not contain any language mandating the payment of monies to individuals who, like the plaintiffs, suffered adverse personnel action by their respective branches of the Armed Forces because they failed to comply with the Mandate. Therefore, *Lummi Tribe of Lummi* is, like the other two cases, distinguishable.

The Court is similarly unpersuaded by the plaintiffs' argument that Section 525 is money-mandating because it provides for retroactive relief. According to the plaintiffs, because Congress used the term "rescind," Congress intended that Section 525 be retroactive: "Rescission means that the rule is eliminated by the issuing authority, effective as of the issuance date (August 24, 2021), rather than the date the rescission was announced (January 10, 2023); the rescinded rule is thus erased from the rulebook." [ECF 24] at 33. The plaintiffs contend that the restoration of pay and benefits is consistent with "the legislative purpose of restoring pre-Mandate levels of morale, retention, recruiting, and total force strength." *Id.* at 34. In addition, the plaintiffs suggest that because Secretary Austin, in his January 10, 2023, memorandum, ordered that "all separations and discharges resulting solely from non-compliance with the Mandate should be halted and that all adverse personnel actions and paperwork should be corrected," it was clear that Congress intended that the statute be retroactive. *Id.* The plaintiffs therefore conclude that "[t]he only dispute is whether in ordering the Secretary to provide retroactive relief, Congress meant to categorically deny monetary relief to service members or

any specific subset thereof, including those like the Plaintiffs who were the first to be pushed out over it." *Id.* at 35.

Generally, "[r]etroactivity is not favored in the law, and congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Hicks v. Merit Sys. Prot. Bd.*, 819 F.3d 1318, 1321 (Fed. Cir. 2016) (internal quotation marks omitted) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)). Thus, the court must "construe a statute to avoid retroactivity unless there is clear evidence that Congress intended otherwise." *Hicks*, 819 F.3d at 1321; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (stating that a statute does not operate retroactively "absent clear congressional intent favoring such a result"). "Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf*, 511 U.S. at 272-73, quoted in *Hicks*, 819 F.3d at 1321-22. Here, there is nothing in the language of Section 525 to suggest that Congress intended for affected service members to retroactively receive monetary relief. *See Sayers v. Dep't of Veterans Affs.*, 954 F.3d 1370, 1380 (Fed. Cir. 2020) (stating that "[t]he statute plainly lacks an unambiguous directive or express command that the statute is to be applied retroactively") (internal quotation marks omitted). Thus, despite the plaintiffs' additional arguments,[5] the Court's inquiry must end. *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1192 (Fed. Cir. 2004), quoted in *Hicks*, 819 F.3d at 1322 (stating that "[i]f the statute is unambiguous, our inquiry is at an end; we must enforce the congressional intent embodied in that plain wording."). In sum, because Section 525 is not a money-mandating source of law, the Court lacks subject matter jurisdiction over Count II.[6]

### B.     Counts I, III and IV – Claims Under the MPA

In Counts I, III and IV, the plaintiffs seek backpay and other relief under the MPA. The plaintiffs allege a violation of the Militia Clauses in Count I, a violation of 10 U.S.C. § 1107a in Count III, and a violation of the RFRA in Count IV. The government argues that the plaintiffs fail to state claims under the MPA for violations of the Militia Clauses, Section 1107a, and the RFRA. Because the plaintiffs allege entitlements to relief under the MPA in each of these counts, the Court considers the sufficiency of the plaintiffs' MPA allegations first.

#### *1.     The Plaintiffs' MPA Allegations*

---

[5] The plaintiffs also contend that the presumption against retroactivity does not apply to remedial or curative statutes like Section 525, that Section 525 applies uniformly to all service members, that the government is judicially estopped from taking a position in this litigation that is contrary to positions it took in previous cases, and that Section 525's legislative history supports their position. [ECF 24] at 32, 35-38. None of these arguments, however, addresses the fact that the plain language of Section 525 does not express a legislative intent to compensate the plaintiffs monetarily (either prospectively or retroactively).

[6] Even if the Court were to view Count II as seeking backpay and other relief under the MPA for failing to reimburse the plaintiffs their pay and benefits after recission of the Mandate, the complaint fails to state a claim for relief because § 525 does not provide for the retroactive payment of monies. *See Schneiter v. United States*, 159 Fed. Cl. 356, 366 (2022) (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)) (stating that "[a] claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief").

10

The government argues that under the MPA, unpaid backpay is mandatory "in only four circumstances: where a plaintiff '(1) was on active duty, 37 U.S.C. § 204(a)(1) (1988); (2) was a reservist who actually performed full-time duties, *id.* § 204(a)(2); (3) was a reservist on active status who actually performed duties, 37 U.S.C. § 206(a)(1)-(2); or (4) was a reservist on inactive status who would have performed duties but for disability, disease, or illness, 37 U.S.C. § 206(a)(3).'" [ECF 23] at 39-40 (internal footnote omitted).[7] According to the government, "[b]ecause no plaintiff alleges he falls into any of these categories—in particular that he did not receive any pay he earned—none of the plaintiffs state a claim under the [MPA]." *Id.* at 40.

It is undisputed that the MPA is money-mandating.[8] *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) (stating that "the [MPA] has previously been held to be money-mandating"). Regarding the application of the MPA to reservists, "the Federal Circuit has made clear that a reservist can only recover pay under the [MPA] for time on active duty or for drills and training actually performed, regardless of whether he was wrongfully removed from duty." *Kuntz v. United States*, 141 Fed. Cl. 713, 717 (2019) (citing *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999)). Thus, "a member who is serving in part-time reserve duty in a pay billet, or was wrongfully removed from one, has no lawful pay claim against the United States for unattended drills or for unperformed training duty." *Palmer*, 168 F.3d at 1314. Conversely, "[i]t is clear that a reservist who alleges that he was unlawfully released from active duty and denied the pay and allowances to which he would have been entitled had he remained on active duty, states a claim under the [MPA]." *Vellanti v. United States*, 119 Fed. Cl. 570, 577 (2015) (citing *Sargisson v. United States*, 913 F.2d 918, 920 (Fed. Cir. 1990)); *see also Radziewicz v. United States*, 167 Fed. Cl. 62, 68 (2023) (stating that "[r]eservists are able to state a claim for backpay if they were participating in full-time active duties until the government's wrongful action.").

Here, the plaintiffs first generally allege that they are entitled to pay because of the nature of their duty orders:

> All Plaintiffs and Class Members who were on [Full-Time National Guard Duty ("FTNGD")], [Active Duty Operational Support ("ADOS"], [Active Guard Reserve] or other Title 32 "active duty" orders, or who performed "Full-time training, training duty with pay, or other full-time duty . . . in [their] status as a member of the National Guard" are entitled to their basic pay for their rank and years of service pursuant to 37 U.S.C. § 204(a)(1) or § 204(a)(2), for the full period from which they were removed from active status or were denied pay, benefits, or points, regardless of whether they actually performed the service where the failure or inability to

---

[7] Reservists include members of the reserve components of the Army, Navy, Marine Corps, Air Force, Coast Guard, and Public Health Service, as well as members of the Army National Guard and Air National Guard. *See* 37 U.S.C. § 101.

[8] Section 204 identifies the types of service members who are entitled to basic pay. 37 U.S.C. § 204. Section 206 identifies the types of service members who are not entitled to basic pay under 204 (members of the National Guard or reservists) and defines their pay scale. 37 U.S.C. § 206(a).

perform is due to the wrongful or unlawful act, rule, regulation or order.

[ECF 20] ¶ 310.[9] Next, the plaintiffs specifically allege each plaintiff's entitlement to pay. Messrs. Botello, Konie, Hood, Santos, and Phillips allege that they were serving in an active-duty capacity or performing full time duties at the time of their removal. *See id.* ¶ 16 (alleging that Mr. Botello "has been on [ADOS] orders under Title 32 . . . was ordered to [FTNGD] and ADOS . . . [and] was removed from and dropped from his orders and active status"); *id.* ¶ 17 (alleging that Mr. Konie "has been in active status for 6 years . . . [and] was allowed to stay on active status in the Guard, but could not attend the necessary SLC in order to be eligible [] for promotion"); *id.* ¶ 18 (alleging that Mr. Hood was "serving on full-time orders under 32 USC 502(f)"); *id.* ¶ 20 (alleging that Mr. Santos "was on FTNGD under 32 U.S.C. § 502(f)"); *id.* ¶ 22 (alleging that Mr. Phillips was operating under "Title 32 orders"). The allegations of these five plaintiffs are sufficient to avoid dismissal for failure to state a claim under RCFC 12(b)(6).[10]

Mr. Taylor, however, does not allege that he was serving in an active-duty capacity or that he was performing full time duties when removed. *See* [ECF 20] ¶ 24 ("[Mr. Taylor] was a drilling (M-day) soldier and senior enlisted member of his unit. [Mr. Taylor] was given a General Officer Reprimand (GOMOR) for being unvaccinated; in May 2022, he was prohibited from drilling, training, or any other activities with his National Guard Unit."). As a result, Mr. Taylor's MPA allegation, and therefore his claims for backpay and other relief under the MPA for violations of the Militia Clauses, Section 1107a, and the RFRA do not survive the government's RCFC 12(b)(6) challenge.[11]

## 2.   *Count I – Violation of the Militia Clauses*

In Count I, the plaintiffs claim entitlement to backpay and other relief under the MPA, arguing that the President and DoD violated "the Militia Clauses' prohibition on punishment or 'govern[ance]' of the non-federalized Militia[.]" [ECF 20] ¶ 254; *see also id.* ¶ 266. Specifically, the plaintiffs allege that "[t]he President and DoD leadership punished unvaccinated, non-federalized Militia members through discharges, withholding of pay from individual Militia members, prohibiting them from participating in drill, training, and other duties, and threats of courts-martial and punishment under the UCMJ." *Id.* ¶ 258. They further allege that "[t]he President and DoD leadership punished unvaccinated non-federalized Militia members through

---

[9] The plaintiffs also allege that, under the constructive service doctrine, they should be awarded payment because they were "'ready, willing, and able' to serve, yet were illegally denied the ability to do so by unconstitutional acts of the President and the Secretary of Defense." [ECF 20] ¶ 313.

[10] Although the government also argues that Messrs. Botello, Hood, Santos, and Phillips cannot state a claim under the MPA because their FTNGD orders do not qualify them as active-duty service members, [ECF 23] at 41, this argument goes to the merits of the plaintiffs' claims, not the sufficiency of their allegations—the only issue relevant to the Court's analysis under RCFC 12(b)(6).

[11] The government also contends that the "plaintiffs also fail to state a claim under the [MPA] because they do not allege that they performed dut[ies] for which they were not paid." [ECF 23] at 31 n.9. As noted above, however, the plaintiffs (apart from Mr. Taylor) do not allege that they are entitled to payment under the MPA because they performed duties for which they were not paid; rather, they allege that they were either on active duty or performed full-time duties as members of the National Guard. *See* [ECF 20] ¶ 310; 37 U.S.C. §§ 204(a)(1)-(2).

wrongful discharges that are categorized as 'misconduct' that prevent reenlistment," *id.* ¶ 263, and that these actions "result in the loss or reduction of, or ineligibility for, . . . [retirement and other benefits] to which they were or otherwise would have been entitled by law," *id.* ¶ 264.

The government states that it "understand[s] Count I to be asserting a stand-alone claim for a violation of the Militia Clauses." [ECF 23] at 39 n.14. Therefore, it argues that the plaintiffs' Count I claims should be dismissed for lack of jurisdiction because the Militia Clauses are not a money-mandating source of law. *Id.* at 21. The Court addressed this argument above, *see supra* Section III.A.1, agreeing with the government and dismissing those portions of Count I. Perhaps suspecting that the plaintiffs' Count I claims could also be viewed as claims for relief under the MPA, the government argues that "[e]ven if plaintiffs attempted to allege they are entitled to backpay under the [MPA] due to an alleged violation of the Militia Clauses, they would fail to state a claim," *id*. at 39 n.14, because none of the plaintiffs are service members entitled to backpay under the MPA, *id*. at 40. Having determined that all plaintiffs (except for Mr. Taylor) sufficiently allege an entitlement to pay under the MPA, the Court finds that these plaintiffs have also adequately stated claims for backpay and other relief under the MPA based on a violation of the Militia Clauses.

The plaintiffs allege that the "Secretary of Defense Lloyd Austin III issued the Mandate, directing the Secretaries of the Military Departments 'to immediately begin full vaccination of all members of the Armed Forces . . . or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19.'" [ECF 20] ¶ 27. They allege that the Secretary then "issued a supplemental directive setting forth punishments for unvaccinated members of the (non-federalized) National Guard and Reserves," *id.* ¶39, and that the Air Force and Army implemented the directives by transferring unvaccinated active status National Guard members to inactive status, *id.* ¶¶ 42-45. As detailed above, *see supra* Section III.B.1, each plaintiff (except Mr. Taylor) alleges that he was in active status and was removed from active status, denied pay, or denied benefits as a result of his unvaccinated status, *id.* ¶¶ 16-23. Further, the plaintiffs allege that the Secretary violated "the Militia Clauses' prohibition on punishment or 'govern[ance]' of the non-federalized Militia," *id*. ¶ 254, by involuntarily transferring them from active status to inactive status; [and] cancelling [] orders to full-time active status, *id.* ¶ 260. As a result, the plaintiffs claim entitlement to backpay and other financial compensation under the MPA. *Id*. ¶ 266. These allegations are sufficient to survive dismissal under RCFC 12(b)(6), and they warrant further discovery to understand the circumstances surrounding the military's implementation of the Mandate with respect to each plaintiff. *See L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 466 (2007) (stating that "the issue is not whether a plaintiff is likely to prevail ultimately, but whether [it] . . . is entitled to offer evidence to support the claims") (cleaned up).

### 3. Count III – Violation of 10 U.S.C. § 1107a

In Count III, the plaintiffs claim entitlement to backpay and other relief under the MPA, arguing that they suffered adverse personnel actions because of the "unlawful order mandating an unlicensed EUA product in violation of 10 U.S.C. § 1107a and express requirements of the Secretary Austin's August 24, 2021[,] Mandate Memo that permitted only FDA-licensed products to be mandated." [ECF 20] ¶ 307. Section 1107a provides in pertinent part as follows:

13

> In the case of the administration of a product authorized for emergency use . . . the condition . . . designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a(a)(1). According to the plaintiffs, although Section 1107a prohibits the military from mandating that service members take an unlicensed EUA product absent presidential authorization, when the Mandate issued, there were no FDA-licensed vaccines available and no presidential authorization of unlicensed vaccines. [ECF 20] ¶¶ 294, 298-300.

The government argues both that the plaintiffs lack standing and fail to state a claim in Count III. [ECF 23] at 31. It asserts that "[e]ven accepting as true plaintiffs' allegation that DoD only had unlicensed EUA vaccines available, nothing in the [M]andate required that plaintiffs receive those unlicensed vaccines." *Id.* at 32. Therefore, the government contends that the plaintiffs cannot establish a causal connection between their injuries and the military's conduct. *Id.* at 33. For these same reasons, the government avers that the plaintiffs have not stated a claim for relief because they "were permitted to obtain commercially available and fully licensed vaccine doses of their choice (which many service members did) to satisfy the requirement," and therefore, the military's policy "did not violate 10 U.S.C. § 1107a because DoD did not require service members to take those [unlicensed] vaccines." *Id.* at 34. The Court finds that the plaintiffs have standing to assert a claim under the MPA for violation of 10 U.S.C. § 1107a and that plaintiffs have adequately stated a claim for relief in Count III.

"[I]n order to invoke federal jurisdiction, a plaintiff has the burden to establish standing under Article III of the Constitution at the time a complaint is filed." *Deeks v. United States*, 2005 WL 6112655, at *4 (Fed. Cl. Feb. 18, 2005) (citing *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003)). Although the United States Court of Federal Claims is an Article I court, it "applies the same standing requirements enforced by other federal courts created under Article III." *Stahl v. United States*, 141 Fed. Cl. 396, 402 (2018) (quoting *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To demonstrate Article III standing, the plaintiff must satisfy three elements: (i) "the plaintiff must allege that it has suffered an injury in fact—an invasion of a legally protected interest;" (ii) "there must be a causal connection between the injury and the conduct complained of;" and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted)). In Count III, each plaintiff (except for Mr. Taylor) alleges that he was a member of the National Guard on active duty when the Mandate was issued, [ECF 20] ¶ 310, that he suffered adverse personnel action by the military as a result of the unlawful mandating of an unlicensed EUA product in violation of 10 U.S.C. § 1107a and the express requirements of Secretary Austin's August 24, 2021, Mandate Memo, *id.* at ¶¶ 293-307, and that such adverse action caused him monetary harm in the form of lost pay and benefits, *id.* ¶¶ 310, 317. The plaintiffs' allegations in Count III satisfy Article III's standing requirements.

The plaintiffs' allegations in Count III also sufficiently state a claim for relief. The plaintiffs claim that complying with the Mandate was impossible because "[n]o FDA-licensed COVID-19 vaccines were available at all at the time that the August 24, 2021 Mandate was issued." [ECF 20] ¶ 299. They further claim that the military unlawfully treated "unlicensed EUA COVID-19 vaccines [as] legally interchange[able] with FDA-licensed vaccines and [required the use of] the unlicensed EUA vaccines . . . 'as if' they were the FDA-licensed product for the purposes of the Mandate." *Id.* ¶ 302. Accepting these allegations as true, the plaintiffs have stated a plausible claim that moves beyond the speculative level. *See Fredericksburg Non-Profit Hous. Corp. v. United States*, 113 Fed. Cl. 244, 253 (2013) (stating that the court may deny a motion to dismiss where the factual allegations move beyond the speculative level). These allegations warrant further discovery to understand the circumstances surrounding the military's implementation of the Mandate with respect to each plaintiff and to determine whether, in implementing and enforcing the Mandate, the military adhered to its requirement that only FDA-licensed vaccines be utilized. *See L-3 Commc'ns,* 79 Fed. Cl. at 466.

        4.      *Count IV – Violation of the RFRA*

In Count IV, the plaintiffs claim entitlement to backpay and other relief under the MPA, arguing that the government violated the RFRA when "[t]he Defendant Agencies each adopted a policy of systematically denying Religious Accommodation Requests [("RAR")] using form letters, without providing 'to the person' individualized determinations required by RFRA, DoDI 1300.17, and the Air Force and Army implementing regulations." [ECF 20] ¶ 327. The plaintiffs allege that they were wrongfully discharged as a result of these RFRA violations. *Id.* ¶ 334. The government argues that four of the six plaintiffs (Messrs. Botello, Hood, Phillips, Taylor) fail to state a RFRA claim because they do not allege that they submitted an RAR or had an RAR denied. [ECF 23] at 35.[12] Alternatively, the government contends that these four plaintiffs fail to state a RFRA claim because they do not allege "facts establishing that it would have burdened them to seek an accommodation." Def.'s Reply [ECF 26] at 21. Regarding the remaining two plaintiffs (Messrs. Konie and Santos), the government argues that although they do allege that they submitted RARs, "they do not allege any facts suggesting they harbored any sincerely held religious belief that was unduly burdened by the vaccine requirement as required under the RFRA standard." [ECF 23] at 35 n.12. The plaintiffs counter that the government's religious accommodation policy and processes are "a sham," [ECF 24] at 44, and that the RARs submitted by Messrs. Botello, Phillips, Konie, and Santos were "ignored without action," *id.* at 45.

The RFRA states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). "If the Government substantially burdens a person's exercise of religion, under the [RFRA] that person is entitled to an exemption from the rule unless the Government

---

[12] Regarding Mr. Botello, the government further argues that his "claim is outside the Court's jurisdiction under 28 U.S.C. § 1500." [ECF 23] at 34. According to the government, because Mr. Botello was a party to a case pending in the United States Court of Appeals for the Fourth Circuit at the time the instant complaint was filed, and because, "[l]ike the claims at issue in this case, the [] plaintiffs [in the other case] alleged, among other things, that the vaccination requirement and DoD's alleged policy of denying RARs violated RFRA," the Court lacks jurisdiction over Mr. Botello's RFRA claim. *Id.* at 38. The Court does not reach this argument because it finds that Mr. Botello has failed to state a claim for relief under the MPA for a RFRA violation.

'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest . . . .'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694-95 (2014) (quoting 42 U.S.C. § 2000bb-1(b)). The RFRA further provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). Additionally, the RFRA does not contain an exhaustion requirement. *See U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 830 (N.D. Tex. 2022) (stating that "[i]f RFRA had an exhaustion requirement, the Court would apply it."). Thus, to state a claim under the RFRA, the plaintiffs need not aver that they first filed RARs, that their RARs were denied, and that their subsequent appeals of the RARs were denied. Rather, the plaintiffs must plausibly allege facts showing that the government has substantially burdened their exercise of religion.

      Here, Messrs. Konie and Santos plausibly allege that the government substantially burdened their exercise of religion in its implementation of the Mandate by failing to properly consider their RARs and that such failure resulted in the wrongful denial of pay and other adverse personnel actions. Specifically, each plaintiff alleges that he submitted an RAR and that his RAR was not properly considered in the implementation of the Mandate. *See* [ECF 20] ¶ 17 (alleging that Konie submitted an RAR, and that he suffered adverse personnel actions as a result of being unvaccinated); *id.* ¶ 20 (alleging that Santos submitted an RAR, that he never heard back on his RAR, and that he suffered adverse personnel actions as a result of being unvaccinated). Additionally, the plaintiffs claim that the DoD and the Armed Services implemented a "sham" process for religious accommodations, *id.* ¶ 215, which "resulted in nearly uniform denials of service members['] requests for religious accommodations, using nearly identical form letters with only names, dates, and titles or duties changed," *id.* ¶ 218. The allegations of Messrs. Konie and Santos in Count IV are sufficient to avoid dismissal under RCFC 12(b)(6). *See Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (stating that the complaint is not required "to set out in detail the facts upon which the claim is based").

      The remaining plaintiffs—Messrs. Botello, Hood, and Phillips—fail to plausibly allege that the government substantially burdened their exercise of religion in violation of RFRA or that any such violation resulted in adverse personnel actions. While it is not necessary for each plaintiff to have filed an RAR to state a claim under the MPA based on an alleged RFRA violation, these plaintiffs fail to make any individual allegations in the complaint regarding their exercise of religion or any burdens placed on such exercise by the government. In response to the government's motion to dismiss, these plaintiffs submitted declarations in support of their RFRA claims. While two of the declarations mention religion, *see* Botello Decl. [ECF 24-2] ¶¶ 7-8, 11, 13, 17-20 (stating that he filed an RAR based on sincerely held religious beliefs and that he suffered adverse personnel actions); Phillips Decl. [ECF 24-3] ¶ 10 (stating that he submitted an RAR and never heard anything back), one does not, *see* Hood Decl. [ECF 24-1] (no mention of religion). Nevertheless, the Court cannot consider allegations made in the plaintiffs' response to the government's motion to dismiss, as they are outside the complaint. *See Mendez-Cardenas v. United States*, 88 Fed. Cl. 162, 166-67 (2009) (holding that a response cannot serve to amend the complaint). Therefore, the allegations of Messrs. Botello, Hood, and Phillips in Count IV are insufficient and are dismissed under RCFC 12(b)(6).

### C. Count V – Claims of Illegal Exaction

In Count V, the plaintiffs claim the following:

> The President and DoD leadership punished unvaccinated non-federalized Militia members through the illegal exaction and recoupment of separations pay, special pays, (re)enlistment bonus payments, post-9/11 GI Bill benefits, costs of training and tuition at military schools or academies and public and private universities, travel and permanent change of station allowances, all of which Plaintiffs were entitled to by law.

[ECF 20] ¶ 339. The government argues that "[p]laintiffs' illegal exaction claim should be dismissed for lack of jurisdiction and failure to state a claim because they fail to allege that five of six plaintiffs actually experienced such exaction or recoupment, and that any suffered an illegal exactment." [ECF 23] at 44. Regarding Mr. Taylor, the government contends that even though he claims he owed the government "back premiums for his life insurance," *id.* at 44-45, he fails to state a claim for illegal exaction because he "does not allege that he disputes the premiums for his [Servicemen's Group Life Insurance ("SGLI")] coverage or allege those premiums were illegally collected from him," *id.* at 45, nor "does [he] challenge the contractual basis for his requirement to pay SGLI premiums, which resulted from his election of SGLI coverage," *id.* The plaintiffs counter that "[Mr.] Taylor has stated a claim for illegal exaction (Count V) because, during the time [he] was prohibited from drilling and not paid, [SGLI] premiums continued, creating indebtedness to the government." [ECF 24] at 48. According to the plaintiffs, "[t]hose premiums were recouped from [Mr. Taylor], in the amount of approximately 8-10 months of SGLI premiums." *Id.* at 48-49 (citing [ECF 20] ¶ 24). The plaintiffs do not otherwise respond to the government's arguments with respect to the sufficiency of their illegal exaction allegations. The Court dismisses Count V under RCFC 12(b)(6) for failure to state a claim.

"Case law involving the Tucker Act, 28 U.S.C. § 1491(a), has long distinguished three types of claims against the federal government: contractual claims, illegal-exaction claims, and money-mandating-statute claims." *Boeing Co. v. United States*, 968 F.3d 1371, 1382 (Fed. Cir. 2020). The latter two claims, "the non-contractual claims[, . . .] can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." *Id.* at 1382-83 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (en banc) (internal quotation marks omitted)). "An illegal exaction occurs when money is improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Christy, Inc. v. United States*, 971 F.3d 1332, 1336 (Fed. Cir. 2020) (internal quotation marks omitted). "Thus, an illegal exaction claim has two elements: 1) that money was taken by the Government; and 2) that the exaction violated a provision of the Constitution, a statute, or a regulation." *Andres v. United States*, 2005 WL 6112616, at *2 (Fed. Cl. July 28, 2005). "[W]hat distinguishes an illegal exaction from a backpay or breach of contract claim, is that in an illegal exaction case the claimant has paid

money over to the Government that he once had in his pocket, and in a backpay or breach of contract claim the claimant is seeking payment of money the claimant has never received." *Id.* at *3; *accord Piszel v. United States*, 121 Fed. Cl. 793, 802 (2015), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016) (stating that "[b]ecause plaintiff cannot show that he has paid any money to the government directly or 'in effect,' he fails to state a plausible illegal exaction claim in the complaint.").

Here, except for Mr. Taylor, none of the plaintiffs states a claim for illegal exaction because none of them alleges that he is owed monies that he previously paid the government, either directly or in effect and none of them alleges that the government's exaction or withholding of monies violated a Constitutional provision, a statute, or a regulation. Rather, the plaintiffs simply claim that they are owed monies.[13] Only Mr. Taylor attempts to state a claim for illegal exaction. However, Mr. Taylor's attempt fails because he does not allege that the government's exaction or withholding of monies—through its recoupment of seven months of SGLI premiums that he did not pay during the time he was precluded from drilling because he was not vaccinated—violated a Constitutional provision, a statute, or a regulation. Further, Mr. Taylor does not challenge the contractual basis for his obligation to pay SGLI premiums. Therefore, none of the plaintiffs has sufficiently stated an illegal exaction claim.

### D.    Count VI – Claims Seeking Correction of Military Records

In Count VI, the plaintiffs seek the correction of their military records under 10 U.S.C. § 1552, in conjunction with the MPA and the 2023 NDAA. [ECF 20] ¶¶ 343, 344. Specifically, the plaintiffs a seek a court order directing the correction of their military records and removal therefrom of "any adverse paperwork resulting from their unvaccinated status or failure to comply with the Mandate." *Id.* ¶ 344. The government argues that Section 1552 is not money-mandating and that the plaintiffs have not otherwise pled a claim "for which plaintiffs could recover damages under the Tucker Act." [ECF 23] at 46. In their response, the plaintiffs "clarify that they do not assert a stand-alone claim under Count V[I] and that any relief requested thereunder would be an incident of and collateral to an award of money judgment under Counts I-V." [ECF 24] at 49. Because the correction of military records is a request for relief rather than a cause of action, the Court dismisses Count VI under RCFC 12(b)(6) for failure to state a claim.

## IV.   CONCLUSION

For the reasons stated above, the government's motion to dismiss, [ECF 23], is **GRANTED-IN-PART** and **DENIED-IN-PART**.

---

[13] *See* [ECF 20] ¶ 16 (Botello "seeks backpay and other financial compensation of at least $200,000, restoration of points, correction of records, and any other appropriate relief."); *id.* ¶ 17 (Konie "seeks compensation for lost pay and benefits in excess of $100,000, correction of his records, and any other appropriate relief."); *id.* ¶ 19 (Hood "seeks backpay and other financial compensation in excess of $61,562.28, retirement points based on an average of points earned in previous years served, and correction of any adverse records."); *id.* ¶ 21 (Santos "seeks backpay and other financial compensation in excess of $70,000.00, retirement points based on an average of points earned in previous years served, and correction of any adverse records."); *id.* ¶ 23 (Phillips "seeks backpay and other financial compensation in excess of $43,925.00, retirement points based on an average of points earned in previous years served, and correction of any adverse records.")

The motion is **GRANTED** with respect to Count I (only those portions that rely on the Militia Clauses as an independent money-mandating source of law) and Count II. These claims **SHALL BE DISMISSED** pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction.

The motion is also **GRANTED** with respect to the claims of Mr. Taylor and Counts IV (with respect to Messrs. Botello, Hood, and Phillips), V, and VI. These claims **SHALL BE DISMISSED WITHOUT PREJUDICE** pursuant to RCFC 12(b)(6) for failure to state a claim for relief.

The motion is **DENIED** with respect to the plaintiffs' remaining claims under Counts I, III, and IV.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge